## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| PANZIE SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:05-cv-329 |
| | ) |
| ALLSTATE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

### ORDER

This matter is before the Court on Defendant's motion for partial summary

judgment. Doc. 29. For the reasons that follow, Defendant's motion is **GRANTED.**

### I. Introduction

Panzie Smith brings this action against Defendant Allstate Insurance Company

("Allstate"). Plaintiff originally filed this action in the Scioto County, Ohio Court of

Common Pleas. Allstate removed the action to this Court based on the Court's diversity

jurisdiction. Allstate alleges that Plaintiff is a resident of Ohio and Allstate is an Illinois

corporation with its principal place of business in Illinois. The Court has subject matter

jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because Plaintiff and

Defendant are citizens of different states and the amount in controversy exceeds $75,000.

1

## II. Background

Plaintiff makes the following allegations in the complaint: Allstate is a corporation engaged in the business of writing fire insurance within the State of Ohio. In consideration of a premium Plaintiff paid to Allstate, Allstate agreed to insure and indemnify Plaintiff under a policy for any fire damage that might occur to the residence located at 140 Shady Lane, Minford, Ohio. See Exhibit 1 to Complaint. On or about May 7, 2004, the Plaintiff's residence at that location was destroyed by two fires, the second of which was a rekindle which occurred several hours after the first fire had been extinguished. The real property at the location was insured for $75,141 for each of the two fires and the personal property was insured for $52,599 for each of the two fires. The Plaintiff's real property loss is $136,995.26 and the personal property loss is $58,184.85. Plaintiff is entitled to recover these losses as well as living expenses for twelve months and the cost of the debris removal. Plaintiff has timely notified Allstate and has timely performed all the conditions required of her.

Based on these allegations, Plaintiff brings two claims for relief. First, she claims Allstate has refused to honor the insurance contract and pay Plaintiff the amounts stipulated in the contract. As relief for this claim, Plaintiff seeks compensatory damages in the amount of $195,180.11, plus living expenses and interest from the date of the fires. Second, Plaintiff claims that Allstate has breached its duty of good faith and fair dealing by refusing to pay her fire loss claims without just cause and that Allstate's conduct has

2

been willful, wanton, and malicious and constitutes an independent wrongful tort. As

relief for this claim, Plaintiff seeks compensatory damages in excess of $25,000, punitive

damages in excess of $25,000, and attorney fees. Plaintiff also seeks to recover interest

and costs.

## III. Factual background

The Allstate insurance policy in issue ("the Policy") describes the "Dwelling

Protection" provided under the Policy as follows:

> We will cover sudden and accidental direct physical loss to property
> described in Coverage A - Dwelling Protection and Coverage B - Other
> Structures Protection except as limited or excluded in this policy.

Panzie Smith depo., exh. 3, p. 5. The Policy further provides that Allstate will cover

"sudden and accidental direct physical loss to the property described in Coverage C-

Personal Property Protection except as limited or excluded in this policy . . . Id., p. 9.

The Policy excludes from coverage loss to property described in Coverages A, B, or C

caused by or consisting of the following:

> 9. Intentional or criminal acts of or at the direction of any insured person, if
> the loss that occurs:
> a)     may be reasonably expected to result from such acts; or
> b)     is the intended result of such acts.
>
> This exclusion applies regardless of whether or not the insured person is
> actually charged with, or convicted of a crime.

Id., pp. 6, 11. In addition, the Policy provides that Allstate does not cover "any loss or

occurrence in which any insured person has concealed or misrepresented any material fact

3

or circumstance." Id., p. 5.

Plaintiff made a claim under the Policy stemming from losses incurred as a result of a fire that occurred at approximately 1:52 a.m. on May 7, 2004, at the residence she shared with her husband, James Marvin Smith, at 140 Shady Lane Road. A second fire occurred at the home several hours after the first fire had been extinguished.

Jennifer Reasor, a property claims representative for Allstate, contacted Plaintiff on the day of the fire and conducted a brief telephone interview with her regarding the fire loss claim Plaintiff had submitted to Allstate. Doc. 29, Reasor Affidavit, exh. A. Reasor avers that during the interview, Plaintiff stated that James Smith had arrived home to find two fire departments battling a house fire at the premises. Id. However, in a sworn statement he provided on August 26, 2004, to Attorney Anthony Iaciofano, who Allstate had hired to investigate the claim, James Smith denied that the fire department was at the scene when he arrived at the first fire and also denied that he had ever told anyone that they were there. Doc. 26, p. 80. Allstate states that based on this discrepancy and other alleged material misstatements regarding the facts of the fire, together with the fact that there were a number of personal property items claimed in the proof of loss for which no remnants were found, it began to more closely investigate the fire.

To further aid in its investigation, Allstate hired Robert Schuele, Managing Partner of SRB Insurance Consultants, Ltd., to conduct interviews on Allstate's behalf with the Smiths' neighbors and a number of witnesses to the fire. Schuele interviewed Angela

4

Smith, a neighbor of the Smiths and no relation to them, concerning what she witnessed as to the first fire. Allstate contends that the deposition testimony Angela Smith subsequently gave in this case is consistent with the information she provided to Schuele in her interview. Angela Smith testified at her deposition that when she stepped outside her house to smoke a cigarette around 1:00 a.m. on the morning of the fire, she looked over and saw "a real bright flashing light." Doc. 29, exh. D., Smith depo., p. 9. When she walked over to the middle of her yard, she saw fire. Id. She also saw James Smith in his red truck pulling out of "the very end" of his gravel driveway. Id., pp. 9-10. He looked surprised to see her and seemed confused. Id., p. 10. When she asked him what was happening, James Smith said that his house was on fire, that he "had to go get Panzie and his dog," that he had just returned from fishing, and that he needed to go get help. Id., pp. 9-10. She asked him if he wanted her to call 911, and he said yes. Id., p. 10. She estimated that "[p]robably about five minutes" elapsed between the time she first saw the fire and the time she saw the truck. Id., pp. 17-18.[1] She testified that she did not hear anyone knocking on any doors or see anyone walking around during those five minutes. Id., p. 18.

Allstate determined that Angela Smith's testimony was inconsistent with James Smith's version of his discovery of the first fire as set forth in his sworn statement. Doc.

---

[1] Allstate represents that Ms. Smith testified at pages 17-18 of her deposition that she saw the truck backing out from "deep" within the driveway, but Ms. Smith testified at this portion of her deposition only that she saw the truck "pull out of the driveway."

5

26. In his statement, James Smith gave the following account of his activities leading to his discovery of the fire: He had been fishing for some time before the fire, having left the house by himself and then driven home without making any stops. Id., p. 69. As he was returning home, he turned onto Shady Lane and saw the fire. Id., pp. 70-71. He stopped in the road between the houses of two of his neighbors, Larry Smith (who is no relation to the Smiths) and Art Fannin. Id., p. 71. He left his truck running and ran up and knocked on Larry Smith's door and then on another neighbor's door, but he got no answer. Id., pp. 75-76. He then turned around at the end of the driveway. Id., p. 77. At that point, Angela Smith ran out and asked him if he wanted her to call 911, and he said that he did. Id. The fire department was not there when James Smith arrived at the house, and he never told anyone that they were there when he first arrived. Id., p. 80.

Allstate determined that James Smith's statement was also inconsistent with Plaintiff's sworn statement of August 26, 2004, which Attorney Iaciofano took on behalf of Allstate. Doc. 28. Plaintiff testified in her sworn statement that James Smith told her that the firemen were there when he got to the fire. Id., p. 73. Later in her statement, she said that he told her he beat on the neighbors' doors when he saw the fire and could not get them up, and then he saw a girl who asked him if he wanted her to call 911. Id., p. 85. When asked if he explained why he was knocking on neighbors' doors if the fire trucks were already there, Plaintiff then stated that he saw the fire before the fire department got there. Id. She explained then that she did not know when he saw that the trucks were

6

there, stating that her husband had told her he had tried to get the neighbors up for the
first fire, a girl said she would call 911, one of the neighbors said he had already called,
and the trucks were already there when Plaintiff arrived. Id., p. 86.

Schuele had personally conducted a tape recorded interview with James Smith
regarding the fire loss on July 7, 2004. Doc. 29, exh. C, Attach. 1. During that interview,
Schuele asked Smith if he was present when the second fire started after the first fire had
been extinguished. Smith stated that he was not there when that happened and that he did
not see the rekindle at all. Id., p. 00050. Allstate found that Smith's statements
conflicted with accounts provided by the Smiths' neighbors, Arthur and Violet Fannin,
who later provided deposition testimony that is purportedly consistent with their earlier
statements. Arthur Fannin testified at his deposition that he saw James Smith in the
Smiths' yard during the second fire. Doc. 29, exh. E, pp. 8-9. Violet Fannin testified that
she was standing with another neighbor, Larry Smith, in his yard during the second fire
when James Smith came running down and said, "Let it burn down." Doc. 29, exh. F, p.
23.

Schuele also interviewed Plaintiff on July 7, 2004. Joint exh. 1. Plaintiff stated in
her interview that she had kept some of her records in the living room and some in the
bedrooms but that everything had been destroyed in the fire. However, her homeowners
insurance policy was in the glove box of her car. She stated that she was at her brother's
house when the first fire occurred and that James Smith called her there to tell her about

7

the fire some time around 1:30 or 2:30 in the morning. She stated that she had locked the doors of the house and that the windows were closed and locked when she left that evening, later adding that her normal routine was to always lock the doors when she left the house. She stated that only she and her husband had keys to the doors.

Plaintiff also testified regarding her financial situation during the interview. Plaintiff stated that the Smiths had filed for bankruptcy four or five years earlier but she did not owe any debts currently. She stated that both she and James Smith were unemployed, they collected social security benefits totaling $1,189 per month, and they had no other monthly income. Plaintiff testified that their monthly expenses ranged from $40 to $50 for electric; $30-100 for gas; $20-$26 for water; $11 for garbage; $150-$200 for food (over and above what they purchased with food stamps); $42 for cable television; $39 for telephone; and $200 a month for the land contract on the house. Plaintiff also testified that she made occasional clothing purchases totaling $150-$200. In the sworn statement that she gave to Attorney Iaciofano on August 26, 2004, Plaintiff revised her monthly expenses slightly and listed additional monthly expenses of $70.00 for car and house insurance and $57.50 for life insurance. Doc. 28, pp. 19-23.

Allstate contends that based on Mr. Scheule's report, it retained Casalinova Investigations, Inc. to perform an investigation and determine the origin and cause of the fire. Rick L. Pletcher of Casalinova conducted fire scene investigations on May 11 and July 9, 2004. See Panzie Smith depo., exh. 6. Plaintiff, James Smith, and representatives

8

of Casalinova and Allstate were present at the first inspection. According to the final report issued on December 12, 2004, the interior examination revealed minimal flame damage to the bedrooms and bathroom, moderate to heavy flame damage to the living room and laundry room, and heavy fire damage throughout the kitchen and dining room. The report noted that the second fire had caused the majority of the fire damage and that the original fire was contained within the dining room and kitchen area. The conclusions reached as a result of the investigation were that the first fire had originated in the dining room; the point of origin was in the area of the breaker box on the east wall; the probable first materials ignited were ordinary combustibles; and the ignition source was an open flame from an intentional human act. The report therefore listed the fire as incendiary in nature. The report further concluded that the second fire was the result of an intentional act rather than a rekindle. The report quotes "NFPA 921 (18.2.5) 2004" in the comments section, which states as follows:

> The 'elimination of all accidental causes' to reach a conclusion that a fire was incendiary is a finding that can rarely be justified scientifically, using only physical data; however, the 'elimination of all causes other than the application of an open flame' is a finding that may be justified in limited circumstances, where the area of origin is clearly defined and all other potential heat sources at the origin can be examined and credibly eliminated. It is recognized that in cases where a fire is ignited by the application of an open flame, there may be no evidence of the ignition source remaining. Other evidence, such as that listed in Section 22.3, which may not be related to combustion, may allow a determination that the fire was incendiary.

On January 13, 2005, Allstate sent a letter to Plaintiff and James Smith informing

9

them it was denying their claim based upon those sections of the policy (1) excluding

coverage for loss to property caused by "[i]ntentional or criminal acts of or at the

direction of any insured person" if the resulting loss may be reasonably expected to result

from such acts or is the intended result of such acts; and (2) excluding coverage for any

loss or occurrence in which any insured person has concealed or misrepresented any

material fact or circumstance. Panzie Smith depo., exh. 4. Allstate stated that the

evidence it discovered in its investigation indicated that the fire was

> most probably not a sudden and accidental direct physical loss, and that it is
> probable either or both of you were responsible for setting fire to the home
> or either or both of you had someone else set fire to the home, an intentional
> act of arson. Since you have both denied any knowledge of the cause of the
> fire, one or both of you have concealed and misrepresented material facts
> and circumstances relating to the fire. In addition, the evidence relating to
> your personal property content claim supports our conclusion that you have
> grossly exaggerated and overstated the content claim, amounting to fraud,
> which supports Allstate's denial of the claim, as well.

Allstate summarized its findings supporting its conclusions as follows: First, there

was evidence of the Smiths' intentional act and arson provided by the Casalinova report.

In addition, the Smiths possessed a strong financial motive to commit arson and to reap

the financial benefits because they had a fixed monthly income of $1,189 ($14,268

annually), they had declared bankruptcy in 2000 in which they had claimed less than $500

worth of clothing, jewelry, furniture and appliances, but they were seeking (1) an

insurance recovery of a structured payout of approximately $88,000 on a home that was

being purchased on a land contract for $18,000 over a 30-year period, (2) approximately

10

$34,000 in "out of sight" replacement costs, and (3) approximately $25,000 for the

balance of their inventory claim; and Mr. Smith had the opportunity to start the fire since

he was at his house at the same time the fire was discovered, the fire was in its initial

stages when he reported his discovery of it, and he had the opportunity to return to his

house from fishing, set the house on fire, and then attempt to notify his neighbors that the

house was on fire.

Second, there was evidence of misrepresentations and concealment of material

facts and circumstances, and there were inconsistencies supporting the probability that the

fire was the result of an intentional act of an insured person. The misrepresentations also

supported a strong probability of gross exaggeration and fraud in the presentation of the

contents claim. These misrepresentations and concealed matters included the following:

- Mr. Smith made a representation during initial interviews that firefighters were already at the scene when he arrived at the first fire but then indicated during his sworn testimony that no fire trucks were at his home and denied informing Allstate or Mr. Pletcher that they were.

- Mr. Smith initially informed Allstate and Mr. Pletcher that he knew something was wrong with the electric panel inside the home and was planning to replace it but denied during his Examination under Oath that he had ever informed Allstate about such problems.

- Mr. Smith denied during a recorded statement that he had stopped anywhere on the way from his house to the fishing spot and back home, while two other individuals, Jesse Smith and Troy Connolley, stated that Mr. Smith had actually stopped at their homes. Also, Mr. Smith indicated during a recorded statement that he went fishing by himself, but Allstate learned during the Examination under Oath that Mr. Smith actually had caught up with Jesse Smith and another man at the fishing hole.

11

- Mr. Smith denied any knowledge as to how recently-placed duct tape used to cover a splice on service wiring located underneath the house, which Mr. Pletcher discovered during his sight inspection, came to be placed there.

- Mr. Smith stated during his initial recorded statement that he was not at the house when the rekindle occurred and that he drove up on it and observed his neighbors Larry Smith and Art Fannin watching the fire. However, during his Examination under Oath, he stated that he was located in a tree-lined area at the back of his property with some loggers, one of whom is related to Mr. Smith, when the rekindle was discovered. Mr. Fannin informed Allstate that he discovered the second fire and informed Mr. Smith about it upon his arrival at the house, and Mr. Smith asked Mr. Fannin to call 911. Mrs. Fannin stated that she overheard Mr. Smith say to Mr. Fannin as they watched the second fire, "Let it burn down."

- Mr. Smith testified that he knew essentially nothing of the personal property and where it was located in the house, where any of the items were purchased, and how much was paid for them.

- Mrs. Smith initially informed Allstate in a recorded statement that she was not at the house during the discovery of the second fire, and she then stated for the first time during her Examination under Oath that she actually discovered the second fire while driving her daughter to the home from the local area, they pulled up to the house, and she then drove to Mr. Smith's father's house to call 911, which was inconsistent with Mr. Smith's version of the discovery of the second fire.

- Mrs. Smith initially reported to Allstate representatives that she had purchased large furniture items at "Big Sandy's," a local furniture store, but when Allstate representative Julie Finley confirmed that the store had no record of any such purchases and confronted her with this fact, Mrs. Smith changed her story to say that she did not know where she had purchased these items.

- Mrs. Smith stated in a recorded statement that all of her important documents had burned in the fire, but a completely undisturbed file cabinet that was empty of all of its contents was found in Mrs. Smith's bedroom.

- Mrs. Smith denied in sworn testimony that she had her inventory ready for Ms. Finley within approximately five days of the fire, but Allstate's records indicate that when Ms. Finley appeared to discuss the inventory for the first time with Mrs. Smith she had an extensive list with prices and values already prepared.

12

- During sworn testimony, Mrs. Smith indicated that both bedroom closets were filled with clothes, but after the fire very few items were located in Mr. Smith's bedroom closet.

- In response to specific questions about the inventory, Mrs. Smith provided minimal detailed information, which was telling since the examination of the property left behind after the fire indicates the likelihood that most of the personal property was of little value, which was inconsistent with the values being claimed.

- There was overwhelming evidence of gross exaggeration of personal property values. The Smiths' November 24, 2000 bankruptcy schedules listed personal property valued at $465. The actual cash value of the fire loss inventory presented 3 ½ years later was $40,949.04, despite the fact that the Smiths lived on a "very small amount of income." In addition, the bankruptcy schedules did not list any collectibles, but the fire loss inventory claimed thousands of dollars worth of collectibles.

- It is inconceivable that several items valued at approximately $4,600 that did not appear on the first inventory presented to Ms. Finley but were added to the "out of sight" inventory list provided to Allstate by a public adjuster could have been left off the initial list by mistake. These included a surround sound system, a handheld camcorder, a Nintendo game system and cartridges, and some jewelry items, all of which were allegedly located in the living room.

- Some rooms of the house, including the Smiths' bedrooms, suffered very little, if any, flame damage. Allstate's investigation included a detailed inspection of the personal property located in the house and in the yard. A significant number of personal property items were still in a condition to be examined in the yard of the property after they had been removed from the house by firefighters. Items located in Mrs. Smith's bedroom would not have burned at all, but the "out of sight" listing for her bedroom included items with a value in excess of $3,000, including jewelry. In addition, the two-drawer file cabinet located in the bedroom was not damaged at all, but all of the papers appeared to have been removed from it.

- The "out of sight" list for Mr. Smith's bedroom claimed items totaling $3,420.40, including 20 pairs of slacks of which no trace was found.

- The bathroom suffered no flame damage but the inventory listed items totaling $1,045.91, including Mrs. Smith's false teeth, and no reasonable explanation was ever provided for why the teeth were not discovered after the fire and why she was not wearing them the night of the fire.

- There was absolutely no evidence left of large items such as the heavy, solid oak entertainment center, the bookshelf with glass doors, the large living room area rug, and the dining room hutch.

Finally, Allstate concluded that the Smiths' failure to cooperate further supported

denial of their claim. Allstate stated its position that due to the circumstances of the case

and the substantial number of items being claimed, and particularly the "out of sight"

items, the cooperation provisions of the policy and Ohio law required at least some

attempt by the insured to verify by written documentation the items being claimed.

Allstate noted that, despite its requests, the Smiths had provided no documentation

whatsoever. For all these reasons, Allstate stated it was denying the Smiths' claim.

## IV. Defendant's motion for partial summary judgment

Defendant moves the Court for an order granting partial summary judgment.

Defendant moves the Court to (1) dismiss Plaintiff's bad faith claim for lack of proof that

Allstate's conduct in denying Plaintiff's claim lacked reasonable justification under the

facts and circumstances, and (2) issue a ruling that Plaintiff is judicially estopped from

recovering insurance proceeds for items that were allegedly owned by the Smiths prior to

formulation of the November 2000 bankruptcy schedules but that were not listed on the

schedules. Allstate argues that it had reasonable justification to deny Plaintiff's claim

based on (1) the means, motive and opportunity evidence to support an arson finding

14

adduced during its investigation of the activities of Plaintiff and her husband, James Smith; (2) the "out of sight" inventory of personal property items that were claimed to be lost in the fire but of which no trace was found; and (3) the differences between the November 2000 bankruptcy filing and the claims made under the Smiths' proof of loss following the fire.

Plaintiff opposes Allstate's summary judgment motion. Plaintiff alleges that it is clear that the cause of the fire was electric and that the second fire was not a new fire but was a rekindle. Plaintiff claims that there is no inconsistency between the written statements submitted into evidence but only between the written statements and the recall of Allstate employees and others' hearsay statements. Plaintiff claims that the intentional misrepresentations of Allstate's employees and their bending of the facts is bad faith. Plaintiff claims that had Allstate fulfilled its continuing duty to investigate, it would have reached the conclusion that neither Plaintiff nor her husband started the first or second fire. Plaintiff alleges that Allstate has no evidence to dispute the existence of the property she claims was destroyed but of which no trace was left. Plaintiff also contends that Allstate is acting in bad faith by comparing the market value of items listed in the Smiths' bankruptcy proceeding, i.e., the money that could be realized if those items were sold, with the replacement cost of items listed on the insurance inventory.

In reply, Allstate denies that it has acted in bad faith, noting that it hired two attorneys, two separate Special Investigation Unit (SIU) investigators, and an entire cause

15

and origin team and that it conducted countless hours of depositions and extensive discovery. Allstate contends that Plaintiff cannot point to a single witness to refute the conclusion that the two separate fires were incendiary in nature, and Plaintiff has no evidence that the second fire was a rekindle as opposed to a new fire. Allstate further contends that Plaintiff's claim was separately and independently denied based on the "Concealment or Fraud" provision of the insurance policy and that this denial was reasonably justified based on Plaintiff's failure to provide any information or documentation in support of the items on the "out of sight" inventory list.

## V. Summary judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphasis in original). The court will not grant summary judgment unless it is clear that a trial is unnecessary.

16

The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id.

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

## VI. Request for oral argument

Defendant Allstate requests oral argument on its motion. The legal and factual issues involved in this case are not complex and they have been fully briefed by the parties. Pursuant to Rule 7.1(b)(2) of the Local Rules of the United States District Court for the Southern District of Ohio, the Court therefore finds that oral argument is not necessary and Defendant's request for same is denied.

17

## VII. Applicable law

The parties agree that Ohio law governs their dispute. In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the insurance policy. Hoskins v. Aetna Life Ins. Co., 6 Ohio St.3d 272, 452 N.E.2d 1315, syll. ¶ 1 (1983). An insurer's lack of good faith in processing claims is referred to as "bad faith" and gives rise to a cause of action in tort against the insurer. Id.

Under Ohio law, "[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." Zoppo v. Homestead Ins. Co., 71 Ohio St.3d 552, 644 N.E.2d 397, syll. ¶ 1 (1994) (citations omitted). In order to grant a motion for summary judgment brought by an insurer on a bad faith claim, the reviewing court must find after viewing the evidence in a light most favorable to the insured "that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." Tokles & Son, Inc. v. Midwestern Indemn. Co. 65 Ohio St.3d 621, 630, 605 N.E.2d 936, 943 (1992), overruled in part on other gds. by Zoppo, 71 Ohio St.3d 552, 644 N.E.2d 397; see also Labate v. Nat'l City Corp., 113 Ohio App.3d 182, 190, 680 N.E.2d 693 (1996) (summary judgment appropriately granted to the defendant on a claim of bad faith breach of contract where the record was devoid of any evidence tending to show a lack of good

18

faith on the part of the defendant).

In Zoppo, the jury returned a verdict for the plaintiff on his bad faith claim arising from the defendant's denial of coverage for a fire loss based on defendant's determination that the insured, Zoppo, had participated in setting the fire, which was incendiary in nature. The court of appeals reversed the trial court's judgment in favor of Zoppo on the issue of bad faith, but the Ohio Supreme Court reinstated the trial court's judgment. The Supreme Court found that despite various leads and the fact that there appeared to have been a robbery and break-in at the property, there was evidence that defendant's investigators had failed to locate certain key suspects, to verify alibis, to follow up with witnesses, or to determine Zoppo's whereabouts on the morning of the fire. 71 Ohio St.3d at 555, 644 N.E.2d at 400. Defendant had instead focused on inconsistencies in Zoppo's statements concerning the sequence of events on the morning of the fire and on the statement of a bar patron implicating Zoppo, which was of questionable reliability. Id. at 556, 644 N.E.2d at 400. The court also noted that the insurer's denial of the claim was based in part on its belief that Zoppo had a motive to destroy the bar, but evidence showing Zoppo had no financial incentive to do so undermined that theory.

In a subsequent unpublished decision, the Ohio Court of Appeals for the Fifth District distinguished Zoppo in determining that the trial court had not erred in granting summary judgment in favor of the insurer on the issue of bad faith based on denial of a property damage claim. See Abon, Ltd. v. Transcontinental Ins. Co., 2005 WL 1414486

19

(Ohio App. 5 Dist.) (unpublished decision). The court initially set forth the three basic elements of an arson defense under Ohio law: (1) fire of an incendiary origin; (2) motive on the part of the insured; and (3) opportunity of the insured to cause the fire. Id. at *5 (citing Caserta v. Allstate Ins. Co., 14 Ohio App.3d 167, 168, 470 N.E.2d 430 (1983)). The court then determined that the evidentiary materials indicated that the facts underlying the insured's loss were subject to fair debate and the insured had failed to present any evidence that the insurer had actual knowledge of a lack of reasonable justification for refusing the claim or had intentionally failed to determine whether there was any such justification. Id.

In distinguishing Zoppo, the court noted that at trial, the Zoppo plaintiff had produced evidence that the insurance company had failed to seriously explore leads that others had set the fire, including the following: (1) prior to the fire, Zoppo had ousted several men from his bar, who then threatened to burn the bar down; (2) three weeks before the fire, there had been an attempt to set the bar on fire; (3) two men who Zoppo had ousted from the bar had publicly bragged that they had set the attempted fire; and (4) one of those men told a group of bar patrons that he had set the actual fire. Id. In contrast, the Abon court determined that there was nothing to justify a finding of bad faith in the case before it. Rather, the evidentiary materials demonstrated that there was a genuine dispute as to the cause of the fire, including evidence from the insurer's independent fire investigator and electrical engineers concluding that electrical devices

20

found near the origin of the fire had not caused the fire and that the fire was incendiary in nature. Id. at *6. In addition, the evidence showed the building was not locked at the time of the fire, the insured was the last known person in the building prior to the fire, the alarm system, which the insured originally represented had been set prior to his exiting the building, had not been set that night, the insured had removed the videotapes from the camera video surveillance system after the fire and claimed to have lost one tape which might have been helpful to the investigation, the slowest moving inventory was destroyed in the fire, and the evidence concerning the financial status of the business prior to the fire was conflicting. Id. at *6. The court noted that the insured had presented evidence that a former employee possibly had a motive and opportunity to set the fire and had argued there was no tangible evidence of arson, and evidence was presented to provide the insured with an alibi at the time of the fire. Id. The court found, however, that this was not sufficient to deny summary judgment in the insured's favor, stating as follows:

From this conflict of evidence it is abundantly clear that the material fact in dispute is whether or not the fire was caused by arson and whether or not [the insured] or someone acting on his behalf caused the fire. However, the very factual dispute that operated to get appellee's arson claim to the jury also operated to preclude appellants' bad faith claim. Stripped to the bare essentials, the central factual issue in the bad faith claim is whether or not appellee had a reasonable basis to deny appellants' claim.

As previously stated, many portions of the record tend to support appellee's belief that appellants had caused the fire. Thus, the evidence shows that the claim was, at the very least, 'fairly debatable.' See Tokles, 65 Ohio St.3d at 630-631, 605 N.E.2d 936. The evidence also demonstrates that reasonable minds could only conclude that appellee's decision was not arbitrary or capricious but was based upon a reasonable justification. We agree with the

21

trial court that evidence that creates an issue of fact on an arson defense is
sufficient, so long as it is not fraudulent, to create the reasonable
justification to defeat a bad faith claim.

Id. at **6-7.

## VIII. Opinion

### A. Bad faith claim

Upon a careful review of the record, the Court finds that "when viewed in the light

most favorable" to her, Plaintiff's claim for coverage was "fairly debatable," and the

evidence demonstrates that Allstate's refusal to pay the claim was premised on

circumstances that provide a reasonable justification for its decision. First, there is

evidence to support an arson defense in this case. The Casalinova investigators ruled out

all causes other than an intentional human act for both fires, and there is no evidence to

support a finding of some other cause. Although the Minford Fire Department report

listed the ignition factor for the first fire as "Electric" (see Panzie Smith depo., exh. 6,

attachment), Minford Fire Chief Rhett Hadsell testified at his deposition that the Fire

Department had not conducted a cause and origin investigation and did not in fact know

what had started the fire. Doc. 30, Hadsell depo., p. 45. He stated that the Fire

Department had listed on their report what they thought caused the fire, which was the

meter box, but they in fact had no opinion as to the cause. Id., p. 46. Chief Hadsell stated

that he agreed with Rick Pletcher of Casalinova that the fire had started near the electrical

box, but there was no indication that electricity had caused the fire and no scientific or

22

investigative basis for saying this was an electrical fire. Id., p. 47. Chief Hadsell also stated that he agreed with the statement by "the NFPA 921" that if electricity and every other source were eliminated, then a fire cause and origin investigator could conclude that a fire was intentionally set by a human being. Id., p. 49. Chief Hadsell also testified that the Minford Fire Department had not performed an origin and cause determination of the second fire and nobody had made a determination as to what had caused that fire. Id., pp. 77-78. There is no evidence in the record that the second fire was a rekindle of the first fire, only speculation to that effect. Thus, there is support for the conclusion that both fires were the result of an intentional human act.

Although Plaintiff generally alleges that the conclusion of Casalinova Investigations was factually unsupported, she has not pointed to any specific defects in the report. Nor has she come forward with any additional evidence to cast doubt on the results of the investigation. The deposition testimony of Chief Hadsell confirms that the Minford Fire Department did not investigate the cause of the fire and simply hazarded a guess as to its origin. No other fire department or expert conducted an investigation into the cause and origin of the fire. Thus, the conclusions in the Casalinova report are not inconsistent with the results of any other investigation. Allstate was therefore reasonably justified in relying on the Casalinova report to determine the cause and origin of the fire.

In addition, the evidence supports Allstate's determination that the Smiths had a motive to burn their house and its contents. Although the Smiths did not have debts, they

23

had been living on small, fixed incomes for many years, and Allstate was justified in concluding, for reasons discussed more fully below, that the recovery the Smiths sought greatly exceeded the actual value of their personal property.

Moreover, Allstate was justified in concluding that James Smith had an opportunity to commit arson. Nobody was at home when the first fire started and was discovered, only the Smiths had access to the locked house, Mr. Smith was alone when the first fire started, he was on the property when the first fire was discovered, and at least one of the conflicting accounts of witnesses placed him at the scene when the second fire was discovered. On this latter point, Plaintiff accuses Allstate of failing to explore evidence that James Smith did not start the second fire and was on a hill overlooking his home when that fire broke out. Plaintiff contends that Allstate apparently never spoke to the two individuals James Smith was allegedly speaking with when the second fire erupted, Sherman Reinsmith and William Mannering, or chose to ignore evidence that he was not responsible for the second fire. Allstate argues that it did consider testimony provided by Reinsmith and Mannering, but their testimony was inconsistent and could not be reconciled with the testimony of other witnesses. It is unclear how Allstate could have considered Reinsmith and Mannering's testimony in denying the claim since they did not provide the testimony Allstate cites as being inconsistent until after Allstate had already denied the claim. See Reinsmith depo., doc. 33; Mannering depo., doc. 34. Nonetheless, Allstate's alleged failure to seriously explore evidence that James Smith was on a hill

24

overlooking his home when the second fire broke out is not evidence of bad faith given that Allstate did question neighbors who were at the scene and the testimony that Reinsmith and Mannering eventually provided was conflicting.[2]

Material discrepancies in statements made by Plaintiff, James Smith, neighbors, and witnesses as outlined in the denial letter provide further reasonable justification for Allstate's decision to deny the Smiths' claim. Although not all of the discrepancies alleged by Allstate are documented in the record, there are sufficient material discrepancies included in the evidence from which Allstate could have reasonably concluded that Plaintiff and James Smith were concealing or misrepresenting material facts and circumstances surrounding the fire.

Finally, Allstate was justified in denying the claim based on its conclusion that the Smiths misrepresented their personal property loss caused by the fire. Allstate had several objectively verifiable bases for concluding that the Smiths grossly exaggerated the personal property loss. The first of these was the difference between the amount of personal property claimed on the Smiths' November 2000 bankruptcy schedules as compared to the personal property claimed on the insurance schedules. On their

---

[2] James Smith testified in his sworn statement that he was talking to a logger, later identified as Mannering, at the end of the lane within sight of his house "for a little bit" when another logger up on a loader said that the house was burning again. Doc. 26, pp. 88, 153. Reinsmith testified at his deposition that he and Smith had been talking for approximately 15 minutes when the fire broke out and that Mannering was not present. Doc. 33, Reinsmith depo., pp. 15-18. Mannering testified that he was also with James Smith when the second fire broke out and had been talking with him for approximately one hour. Doc. 34, Mannering depo., p. 23.

bankruptcy schedules, the Smiths listed furniture and appliances valued at $415; jewelry valued at $15; clothing valued at $25; books and decorations valued at $10; a stove and refrigerator valued at $45; beds and bedding valued at $20; and an organ worth $30.00. Panzie Smith depo., exh. 10. After the fire, they made a claim for a personal property loss of $58,184.85. Id., exh. 9. Allstate could reasonably determine the Smiths' claim was severely inflated and was false when considered in light of the fact that they had purportedly acquired most of this property in the 3 ½ years following their declaration of bankruptcy on a combined monthly income of $1,189. If the monthly expenses of approximately $600 per month that Plaintiff outlined in her sworn statement are subtracted from their monthly income, this would have left the Smiths with approximately $24,700 for discretionary spending in the years following their bankruptcy. This total does not take into account other expenses that the Smiths had such as clothing, for which Plaintiff testified she occasionally spent $150-$200; pre-paid phone cards, which Plaintiff testified she purchased for a cell phone that she had before the fire; and other expenses the Smiths likely had such as car maintenance, gasoline, house maintenance, toiletries, over-the-counter medicines, recreation, gifts, etc. Plaintiff has offered no logical explanation for how she and her husband could have acquired the more than $40,000 in personal property they purportedly accumulated following their bankruptcy given their limited incomes and their monthly expenses, even accepting that some of the items were allegedly purchased second-hand or were received as gifts. Plaintiff suggests only that

26

the discrepancy between the value of property reflected in the bankruptcy schedules and the insurance inventory can be explained by the fact that the amounts listed on the bankruptcy schedules are market values while the amounts listed on the insurance inventory are replacement costs. This does not begin to explain, however, how the Smiths could have acquired such a vast amount of personal property in a relatively short period of time given their meager income. Allstate was clearly justified in concluding the Smiths misrepresented the personal property loss on this basis alone.

In addition, according to Allstate, Plaintiff claimed on the insurance inventorties that the Smiths had owned approximately $10,000 of the personal property listed for at least four years. The insurance inventory includes among such items two sewing machines valued at $700; an antique mandolin valued at $328; a handmade quilt and rack valued at $480; a stove valued at $800; furniture valued at hundreds of dollars; and Boyds Bears worth approximately $1,000. If in fact the Smiths owned this property when they filed bankruptcy, they should have included the property on their bankruptcy schedules. Plaintiff has not even attempted to explain why valuable items that the Smiths purportedly owned at that time were omitted from the bankruptcy schedules. This discrepancy further justified Allstate in its conclusion that the Smiths misrepresented their personal property loss resulting from the fires.

Finally, Allstate was justified in concluding that the Smiths had made misrepresentations concerning "out of sight" property items. Joseph Groh, who was in

27

charge of the investigation for Allstate, testified that he went through the rubbish pile that was left in the Smiths' front yard after the fire. Doc. 40, exh. 2, Groh depo., pp. 25-26. He testified that, inexplicably, he did not see any trace of certain items that should have been there given that the fire department had thrown everything from the living room, which did not burn in the first fire, out into the yard after that fire. Id., pp. 25-26.[3] These included the Boyds Bears; a large oriental rug from the living room, which a table and a couch with wooden legs which were barely charred in the fire had purportedly been sitting on; the oak cabinet that the television was allegedly sitting in, although the television was not melted but was still intact; and Longaberger baskets, although other baskets were found in the rubble. Id. Mr. Groh also testified that he went through the bathroom looking for Plaintiff's false teeth and could not find them, although he found her toothbrush. Id. at 26. These suspicious circumstances justified Allstate's denial of the personal property loss claim under the policy's "Concealment or Fraud" provision.

In short, Allstate has demonstrated that it conducted a thorough investigation of the Smiths' claim. Plaintiff has not shown what additional steps Allstate reasonably should have taken in performing its investigation. Nor has Plaintiff shown that Allstate made intentional misrepresentations or otherwise acted improperly in connection with the investigation of Plaintiff's claim. After considering all the evidence of record, the Court

---

[3] Fire Chief Hadsell confirmed at his deposition that the flame damage to the bedrooms and bathroom was minimal and that the majority of the fire damage resulted from the second fire. Doc. 30, Hadsell depo., pp. 39-40.

finds the claim was "fairly debatable" and the circumstances provided reasonable justification for the denial. Plaintiff has simply not come forward with any evidence tending to show a lack of good faith on the part of Allstate in the handling of her claim. For these reasons, Allstate is entitled to summary judgment on Plaintiff's bad faith claim.

B. Judicial estoppel

Allstate argues that based on the holding in Smith v. Fireman's Fund Ins. Co.,1994 WL 6043 (6th Cir. 1994) (unpublished decision), the Smiths are estopped from making an insurance claim for any items owned prior to the Smiths' bankruptcy that were not listed on the bankruptcy schedules. Plaintiff objects to Allstate's failure to supply a copy of the Fireman's Fund decision to the Court.[4] Plaintiff also claims that the decision is of no relevance to this case because Plaintiff did not conceal anything from the bankruptcy court and, unlike the situation in Fireman's Fund, all that is in dispute is the valuation of property, not its existence.

"The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." Id. at *3. The purpose of the doctrine is to protect the courts from the perversion of judicial machinery. Id. (citing Reynolds v. Commissioner, 861 F.2d 469, 472 (6th Cir.1988) (citations omitted).

---

[4] While Plaintiff correctly notes that Allstate should have supplied a copy of the Smith decision to the Court, the omission will not preclude the Court from considering the applicability of the Sixth Circuit's reasoning in Fireman's Fund to the facts of this case.

29

In Smith, the Court found the plaintiffs "had not been consistent regarding the total value of their personal possessions," having claimed in their 1984 bankruptcy petition the total value of their personal possessions as $4,010, but listing in their 1990 contents inventory for Fireman's Fund $21,000 worth of personal possessions purchased prior to 1984. Id. The Court found that the plaintiffs could be judicially estopped based on their inconsistent positions from recovering under the insurance policy for any items they had failed to disclose in the bankruptcy proceeding. Id.

Comparing the bankruptcy schedules to the insurance inventory in the present case, it is apparent that certain items claimed on the inventory that the Smiths purportedly owned in 2000 are not listed on the bankruptcy schedules. To the extent Plaintiff seeks to recover in this proceeding for items that the Smiths owned when they filed bankruptcy but did not disclose in the bankruptcy proceedings, she is taking an inconsistent position that subverts the judicial process. Accordingly, Plaintiff is judicially estopped from obtaining a recovery in this proceeding for any property that the Smiths allegedly owned at the time of the bankruptcy proceedings, and thus would have been obligated to disclose in those proceedings, but which they failed to disclose.

## IX. Conclusion

Defendant's motion for partial summary judgment (doc. 29) is **GRANTED**. Judgment is granted in favor of Defendant on Plaintiff's bad faith claim (Count II). Plaintiff's recovery, if any, on her breach of contract claim is limited under the doctrine of

30

judicial estoppel as set forth herein.

**IT IS SO ORDERED**.

Date: December 29, 2006                    S/Sandra S. Beckwith
                                           Sandra S. Beckwith, Chief Judge
                                           United States District Court

31